## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| MARATHON PETROLEUM CORPORATION; SPEEDWAY LLC; MARATHON PREPAID CARD LLC; and SPEEDWAY PREPAID CARD LLC; | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. _____ |
| THOMAS COOK, in his capacity as the Secretary of Finance for the State of Delaware; DAVID M. GREGOR, in his capacity as the State Escheator of the State of Delaware; and MICHELLE M. WHITAKER in her capacity as the Audit Manager for the State of Delawareb | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## VERIFIED COMPLAINT FOR EQUITABLE, DECLARATORY, INJUNCTIVE AND OTHER RELIEF

Plaintiffs Marathon Petroleum Corporation ("Marathon"), Speedway LLC ("Speedway"), Marathon PrePaid Card LLC and Speedway Prepaid Card LLC (collectively "Plaintiffs"), for their claims against Defendants Thomas Cook, in his capacity as the Delaware Secretary of Finance (the "Secretary"), David M. Gregor, in his capacity as the Delaware State Escheator (the "State Escheator"), and Michelle M. Whitaker, in her capacity as the Delaware Abandoned Property Audit Manager (the "Audit Manager," together with the Secretary and State Escheator, the "Defendants"), seek a declaratory judgment and preliminary and permanent injunctions, and allege as follows:

## NATURE OF THE ACTION

1.      This lawsuit presents a facial challenge to provisions of the Delaware escheat law, 12 *Del. C.* § 1101, *et seq.* (the "DUPL") that authorizes the State Escheator to claim unclaimed property and to conduct examinations of companies' books and records because it violates and is preempted by federal common law and violates the Fourth Amendment to the United States Constitution.   Defendants have been conducting an examination of records to determine Plaintiffs' compliance with the DUPL *for nine years* through their designated agent, a contingent fee contract auditor Kelmar Associates, LLC ("Kelmar"), without any findings of material or systemic noncompliance.   Nevertheless, to ensure it would be compensated, Kelmar ignored Plaintiffs' records related to a gift certificate program offered from 1987 to November 1999 and instead simply *estimated* a liability in the amount of more than $8 million for the period *1986 through 2000*.  Plaintiffs objected to the use of estimation because they have records of issuances and redemptions of gift certificates and those records show there is no unreported unclaimed property escheatable to Delaware.  Then, nine years into an audit that Delaware regulations say should take only two years, 10 De. Reg. 699 (Oct. 1, 2006), Defendants proceeded to audit stored value gift cards issued by Marathon PrePaid Card LLC ("MPPC") and Speedway Prepaid Card LLC ("SPPC").  However, because those two entities are Ohio limited liability companies that do not obtain names and addresses of purchasers or recipients of their gift cards, Delaware lacks standing to claim any unredeemed gift cards issued by MPPC and SPPC, even if they have any, under the federal common law "priority rules" established by the United States Supreme Court in *Texas v. New Jersey*, 379 U.S. 674 (1965), *Pennsylvania v. New York*, 407 U.S. 206, 216 n.8 (1972), and *Delaware v. New York*, 507 U.S. 490, 500 (1993) (collectively the "*Texas Cases*"), which preempt state escheat laws.  Defendants nevertheless are exercising their authority under §

1155 of the DUPL to audit MPPC's and SPPC's books and records by authorizing Kelmar to issue an information document request ("IDR") to obtain voluminous, over broad and irrelevant information and documents from Plaintiffs concerning gift cards issued by MPPC and SPPC, which, under federal law, Delaware lacks standing to claim by escheat. Although Plaintiffs produced documents sufficient to demonstrate that MPPC and SPPC are outside of Delaware's jurisdiction under the *Texas Cases*, in a January 26, 2016 letter, Kelmar informed Plaintiffs that their failure to comply fully with the IDR by February 19, 2016 "will result in [Defendants] referring the matter to the Attorney General's Office for … enforcement action" on February 22, 2016.  *See* January 26, 2016 letter, attached as Exhibit A hereto.

2.      Plaintiffs bring this application for a declaratory judgment and injunctive relief, pursuant to 28 U.S.C. §§ 2201 and 2202, against Defendants by way of Verified Complaint. Plaintiffs seek to enjoin Defendants from enforcing the DUPL against Plaintiffs in a manner that violates federal common law, which preempts the DUPL, and infringes on Plaintiffs' rights under the Fourth Amendment to the United States Constitution, U.S. Const. amend. IV.

3.      Plaintiffs also bring this action pursuant to 42 U.S.C. § 1983 to enjoin Defendants' deprivation of Plaintiff's rights, privileges and immunities as guaranteed by the Constitution of the United States.

4.      Any action by Defendants to enforce the request for documents is unlawful and should be enjoined because, *inter alia*:

a.      The DUPL violates and is preempted by the federal common law established in the *Texas Cases*, by authorizing the State Escheator to claim purported unclaimed property that Delaware lacks standing to claim under federal law.  *See New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 392 (3d Cir. 2012).

b.      The DUPL violates the Fourth Amendment protection against unlawful search and seizure by authorizing the State Escheator to search Plaintiffs' confidential, privileged and proprietary records without any reasonable basis for such a search and without providing a procedure for pre-compliance review.  *See City of Los Angeles California v. Patel*, 135 S.Ct. 2443 (2015).

c.      Plaintiffs seek preliminary and permanent injunctions enjoining Defendants from enforcing the DUPL and assessing penalties against Plaintiffs for gift cards issued by MPPC and SPPC and enforcing the IDR.

## THE PARTIES

5.      Plaintiff Marathon, f/k/a MPC Holdings Inc., is a corporation organized under the laws of the State of Delaware, with its principal place of business in Findlay, Ohio.  It was originally formed on November 9, 2009 as a subsidiary of Marathon Oil Corporation.  Marathon was spun off from Marathon Oil Corporation and became a separate, publicly owned corporation whose common stock began trading on the New York Stock Exchange on July 1, 2011.

6.      Plaintiff Speedway, f/k/a Speedway SuperAmerica LLC, is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Enon, Ohio.

7.      Plaintiff MPPC is a limited liability company organized under the laws of the State of Ohio on June 14, 2002, with its principal place of business in Findlay, Ohio.  MPC LP is the sole member of MPPC.

8.      Plaintiff SPPC is a limited liability company organized under the laws of the State of Ohio on April 4, 2001, with its principal place of business in Enon, Ohio.  Speedway is the sole member of SPPC.

9.     Thomas Cook is the Delaware Secretary of Finance, located at Carvel State Office Building, 820 North French Street, Wilmington, Delaware.  The Delaware Escheat Law provides that "[t]here shall be an Escheator of the State, who shall be the Secretary of Finance or the Secretary's delegate.  The administration and enforcement of [the Delaware Escheat Law] are vested in the Secretary of Finance or the Secretary's delegate." *See* 12 *Del. C.* § 1102.

10.     David M. Gregor is the Secretary's delegate as the Delaware State Escheator, located at Carvel State Office building, 820 North French Street, Wilmington, Delaware.  "The State Escheator may make such rules and regulations as the Escheator may deem necessary to enforce [the Delaware Escheator Law]." *Id.* § 1154.

11.     Michelle M. Whitaker is the Delaware Abandoned Property Audit Manager and reports directly to, and under the direction of, the State Escheator.  If the Audit Manager concludes that a person has under reported unclaimed property to Delaware, the Audit Manager may issue a statement of findings and request for payment, which becomes a final determination of liability, including interest and penalties, after 60 days and is then subject to enforcement by the State Escheator. *Id.* § 1156(a).

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under 28 U.S.C. § 1331, as the case presents a controversy arising under the laws and Constitution of the United States.  Jurisdiction over claims for declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in the district and a substantial part of the events giving rise to the claim occurred in this district.

## ALLEGATIONS

## LEGAL BACKGROUND

### Delaware Escheat Law

14.     Each of the 50 states and the District of Columbia has unclaimed property laws pursuant to which the states hold property that is unclaimed by the owners as custodians until the owners claim such property.

15.     Delaware regulates the reporting and collection of unclaimed and abandoned property pursuant to the DUPL.

16.     In Delaware, unclaimed or abandoned property is "property against which the full period of dormancy has run." *Id.* § 1998(1).  The "period of dormancy" in Delaware is five years.  *Id.* § 1198(9)a.

17.     A "holder" of unclaimed property is any person having "possession, custody or control of the property of another person ... and every other legal entity incorporated or created under the laws of [Delaware] or doing business in [Delaware]."  12 *Del. C.* § 1198(7).

18.     An "owner" of property under the DUPL is "any person holding or possessing property by virtue of title or ownership."  *Id.* (emphasis added).

19.     The DUPL requires a holder to report and pay unclaimed property on or before March 1 for property that has reached the full dormancy period as of the previous December 31.

20.     The State Escheator may assess interest and penalties for noncompliance.  *See* 12 *Del. C.* § 1159.

21.     The State Escheator may "at reasonable times and upon reasonable notice examine the records of any person or business association or organization to determine whether the person has complied with any provision of [the DUPL]."  *Id.* § 1155.

22.    The State Escheator also "may by summons require the attendance of any person having knowledge in the premises, and may take testimony and require proof material for the investigation with the power to administer oaths to such person or persons." *Id.*

23.    Regulations promulgated by the Delaware Department of Finance, 10 De. Reg. 699 (Oct. 1, 2006), provide the manner in which the State Escheator may conduct examinations pursuant to 12 *Del. C.* § 1155.  Pursuant to those regulations:

> The State expects the Holder's cooperation and anticipates … the time to complete a typical audit should not exceed twelve (12) months. … Interest and penalty may be assessed pursuant to § 1159 . …During the examination, the auditor will review all necessary books and records, interview key personnel and review relevant policies and procedures related to abandoned property.  During the examination, the auditor may make subsequent requests to the Holder for additional books and records as required to complete the audit.

24.    There is no procedure for pre-compliance independent review during an examination, other than to "contact the State directly to address issues or related to the audit."  10 De. Reg 699. (Oct. 1, 2006).

25.    When companies object to information requests, the Audit Manager regularly threatens to assess penalties and/or interest for the failure of the company to "cooperate."

26.    As of 2014, approximately 90% of unclaimed property audits conducted for Delaware was being conducted by Kelmar.  Kelmar was created in October 2001 and has conducted unclaimed property audits on behalf of Defendants and their predecessors since shortly thereafter under long term contracts pursuant to which Kelmar's compensation has been made contingent upon and limited by the amount of unclaimed property liability companies pay as a result of the audits.

27.    Under its contract with Delaware, Kelmar can collect fees in amounts up to 12% of amounts holders pay as a result of a Kelmar audit.  If Kelmar's fees exceed the 12% limit on a

particular audit, Kelmar can collect the uncollected excess (referred to as a "Receivable") against a liability paid by another holder Kelmar audits for Delaware, provided Kelmar collects no more than 12% of any liability paid by an audited holder.

28.    Receivables expire and Kelmar forfeits those amounts after three years, so Kelmar has an incentive to generate as large a liability as possible on every single audit to ensure that it collects uncollected Receivables from audits generating little or no holder liability from other audits before the Receivables expire.  The greater the liability resulting from a Kelmar audit, the more compensation Kelmar can collect and the less it must forfeit.

29.    Delaware paid Kelmar $207,217,260 in fees in 2004 through 2014, even though some audits have resulted in little or no liability being assessed against the holder.

### The Federal Common Law

30.    A state in which unclaimed tangible property is located has jurisdiction to claim that property by escheat.  But, unlike tangible property, intangible property "is not physical matter which can be located on a map," and, thus, potentially gives rise to conflicting claims by different states.  *Delaware*, 507 U.S. at 498.

31.    Therefore, in *Texas*, 379 U.S. at 677, the Supreme Court exercised its original jurisdiction over disputes between states to establish a set of "priority rules" to settle the issue of which state has standing to claim unclaimed intangible property.

32.    The priority rule analysis is a three step process.  First, a court must "determine the precise debtor-creditor relationship as defined by the law that creates the property at issue."  *See Delaware*, 507 U.S. at 499.  "Second, because the property interest in any debt belongs to the creditor rather than the debtor, the primary rule gives the first opportunity to escheat to the State of 'the creditor's last known address as shown by the debtor's books and records.'"  *See id.*  at

499-500 (*quoting Texas*, 379 U.S. at 680-681). "Finally, if the primary rule fails because the debtor's records disclose no address for a creditor ... , the secondary rule awards the right to escheat to the State in which the debtor is incorporated." *Id.* at 500.

33.    In *Texas v. New Jersey*, the Supreme Court stated that it was creating federal common law to prevent against potential multiple liability and was specifically creating the priority rules to create a uniform rule that was easy to apply, would not raise factual or legal issues, and would allocate escheats to the states in a manner that was fair in that it tended to distribute escheats among the states in the proportion of the commercial activities of their residents.

34.    The priority rules are federal common law that preempts state escheat laws. *See Pennsylvania*, 407 U.S. at 216 n.8; *Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 755 F.Supp. 2d 556, 608 (D.N.J. 2011), *aff'd sub nom N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012).

## **FACTUAL ALLEGATIONS**

35.    Marathon is an independent petroleum product refining, marketing, retail, and transportation company.   Pursuant to branded product and supply and trademark license agreements, Marathon brand gasoline is sold through independently owned Marathon brand retail outlets in nineteen states in the Midwest and Southeastern United States, including in Alabama, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin.

36.    Speedway is an indirect subsidiary of Marathon and operates a chain of combination gas station and convenience stores under its namesake brand.

37.   MPPC is an issuer of stored value gift cards bearing the trade name "Marathon" that are redeemable for fuel and/or merchandise at Marathon brand retail outlets and do not expire.

38.   MPPC is a party to a Prepaid Card Agreement, pursuant to which Marathon Petroleum Company LP, f/k/a Marathon Petroleum Company LLC, a subsidiary of Marathon ("MPC LP"), is paid a commission for marketing gift cards issued by MPPC through Marathon's branded retail network, Marathon's website, and from Marathon's company office.   Pursuant to that agreement, MPC LP agrees to transfer revenue from the sale of such gift cards to MPPC on a monthly basis and to accept the gift cards from consumers in exchange for fuel and/or merchandise.   MPPC agrees to transfer funds for redeemed gift cards to MPC LP on a monthly basis.

39.   MPPC also is a party to a Prepaid Card Sales and Service Agreement with SVM, LP, pursuant to which SVM, LP markets gift cards issued by MPPC to third parties.   SVM, LP purchases the gift cards from MPPC at a discount and resells them at face value.   SVM, LP also maintains, for a fee, a website linked to Marathon's home pages to sell MPPC gift cards.   SVM, LP is located in Des Plaines, Illinois.

40.   Further, MPPC is a party to a Prepaid Card Sales and Service Agreement with Scripcents LLC, a company located in Kalamazoo, Michigan, pursuant to which Scripcents LLC agrees to market gift cards issued by MPPC to third parties.   Scripcents LLC purchases the gift cards from MPPC at a discount and resells them at face value.

41.   In addition, MPPC is a party to a Prepaid Card Sales and Service Agreement with National Gift Card Corporation ("National") pursuant to which National agrees to market gift cards issued by MPPC to third parties.   National purchases the gift cards from MPPC at a discount and resells them at face value.   National is located in Crystal Lake, Illinois.

42.   SPPC is an issuer of stored value gift cards bearing the trade name "Speedway" which do not expire and are redeemable for fuel and/or merchandise sold at Speedway and Rich Oil retail outlets.

43.   Speedway and SPPC are parties to a Prepaid Card Agreement pursuant to which, *inter alia*, Speedway is paid a commission to market gift cards issued by SPPC which bear the "Speedway" trade name and trademarks.   Pursuant to that agreement, Speedway agrees to transfer revenue from the sale of such gift cards to SPPC on a monthly basis and to accept the gift cards from consumers in exchange for fuel and/or merchandise.   SPPC agrees to transfer funds for redeemed gift cards to Speedway on a monthly basis.

44.   On May 31, 2007, the then Delaware State Escheator sent a letter to Marathon Oil Corporation stating "its intention to examine the books and records of the corporation for the purpose of determining your compliance with the <u>Delaware Escheat </u>laws."   (underlining in original).  He further stated that the examination would be conducted by "Kelmar Associates on behalf of the State of Delaware as state of incorporation of, Marathon Oil Corporation, Subsidiaries & Related Entities."

45.   At that time, several subsidiaries of Marathon were subsidiaries of Marathon Oil Corporation and therefore the examination included such Marathon subsidiaries.

46.   Kelmar requested voluminous detailed financial records for periods back to 1981, including, but not limited to, federal income tax returns, detail transaction level information concerning every general ledger account, bank statements, outstanding check lists, void/stop check lists, and customer credits.  Marathon, Speedway and their affiliates produced the records it had in its possession.

47.   Marathon filed unclaimed property reports in Delaware in each year 1998 through 2001, and 2005 through 2011.

48.   Kelmar also requested, and Marathon produced, detailed accounting records of coupons issued and redeemed under a coupon program MPC LP offered through 2004.  Pursuant to that program, MPC LP did not retain address records for recipients of coupons.

49.   Marathon was spun off from Marathon Oil Corporation and became a separate, publicly owned corporation whose common stock began trading on the New York Stock Exchange on July 1, 2011.   Defendants continued to audit Marathon and its subsidiaries separately from Marathon Oil Corporation.

50.   After years of auditing, Kelmar informed Marathon and Speedway that based on its examination, it had recommended to Delaware, and Delaware accepted the recommendation, that there be no finding of liability as to accounts payable and/or payroll property.

51.   Kelmar also audited Speedway paper gift certificates.   From 1987 through November 1999, Speedway had issued paper gift certificates in $5 denominations.   The gift certificates were also issued for public relations purposes, such as an apology to a customer for a bad experience at a Speedway store.

52.   Gift certificates were issued exclusively from Speedway's corporate offices, and the paper gift certificates were sold, or distributed for customer satisfaction purposes, through the corporate office only.   The gift certificates were never sold through a Speedway retail location and there was minimal marketing of gift certificates.

53.   Beginning in 1995, Speedway sales of gift certificates increased because of bulk sales to charitable organizations and other bulk purchasers.   Speedway stopped selling and issuing paper gift certificates at the end of November 1999.

54.     Speedway did not obtain names and addresses of purchasers or recipients of the gift certificates.

55.     Kelmar requested detailed information related to those paper gift certificates and Speedway initially produced a representative sample of the information it maintained for its gift certificate program for a selected time period to demonstrate the type of documentation that was available.

56.     On October 25, 2012, Kelmar issued an Interim Status Report ("ISR") *estimating* a liability for unredeemed gift certificates in the amount of $8,231,049.20 for the period 1986 through 2000, even though gift certificates were issued in 1987 through November 1999.

57.     In response to the ISR, on March 8, 2013 Speedway produced extensive additional documentation related to its gift certificates, including sales and redemptions data from 1987 through 1999 and supporting accounting detail for that data for years 1996, 1997, and 1998.

58.     Kelmar subsequently requested additional detailed information several separate times, and Speedway responded by providing the requested accounting records.

59.     Speedway's books and records for its gift certificate program showed no outstanding liability for unredeemed gift certificates.

60.     Kelmar ignored the documents Speedway produced and issued a Report of Examination ("ROE") on May 20, 2013 again *estimating* a liability in the amount of $8,231,049.20 for the period 1986 through 2000 for alleged escheatable unredeemed gift certificates, rather than relying on Speedway's books and records of its gift certificates issuances and redemptions, which showed that Speedway had no outstanding liability for unredeemed gift certificates.

61.    In an audit, thirty days after issuance of an ROE, the Audit Manager may issue a Statement of Findings and Request for Payment (a "Statement of Findings").

62.    "Sixty days after the date on which the Audit Manager mails a statement of findings and request for payment, it shall constitute the Audit Manager's final determination of the amount of the holder's liability, including interest and penalties, if any …"  12 *Del. C.* § 1156(a).

63.    In a June 18, 2013 Memorandum, Marathon's counsel at the time protested the estimated liability in the ROE for Speedway's gift certificate program, including the methodology used and the assumptions underlying the estimate.

64.    It was not until March 6, 2014 that Audit Manager, Michelle Whitaker responded that the estimate was based on "best available information," even though the best available information was Speedway's records, which Speedway had produced showing issuances and redemptions, so no estimation was warranted or authorized.

65.    Marathon had been following a lawsuit, *Select Medical Corporation v. Cook, et al.*, C.A. 1:13-cv-00694-LPS (D. Del. Apr. 17, 2013), that raised the same issues Marathon was raising – *i.e.*, that Defendants could not estimate a liability for unreported unclaimed property where records existed.   Marathon learned that the lawsuit had been settled, days before a scheduled preliminary injunction hearing, in a public settlement in which the holder did not pay a liability and obtained a release of its filing obligations under the DUPL for the audit period.

66.    Thereafter in April 2014, Marathon discussed the ROE for gift certificates with Ms. Whitaker and objected to any use of estimation because Speedway had records of actual gift certificate sales and redemptions, which showed no escheatable gift certificates.

67.    Kelmar subsequently requested even more information related to the gift certificate program, to which Speedway responded on June 12, 2014 and August 19, 2014.

68.    Eight months later, on April 7, 2015 Kelmar informed Marathon that Kelmar would be issuing an IDR for stored value gift cards issued by MPPC and SPPC.

69.    After nine years of auditing and knowing that MPPC and SPPC existed, Kelmar issued that IDR on April 24, 2015 requesting extensive detailed information to be produced within thirty days (on May 25, 2015) related to MPPC's and SPPC's gift card businesses, including, *inter alia*:

a.    a description of the program;

b.    whether name/address information is captured and/or maintained by MPPC and/or SPPC;

c.    cumulative debits and credits posted to general ledger accounts related to gift cards;

d.    narratives on how sale proceeds and unused card balances are accounted for;

e.    "all documents and communications" related to Marathon's decision to form MPPC in 2002 and SPPC in 2001;

f.    "all documents and communications"  related to the reasons for organizing MPPC and SPPC in Ohio;

g.    "all documents and communications" related to analyses regarding potential benefits, including cost savings and/or increased earnings, that could be derived from organizing MPPC and SPPC in Ohio and/or outside of Delaware;

h.    "all documents and communications" relating to the formation, structure and accounting for MPPC and SPPC, "including without limitation," the governance structure of MPPC and SPPC, an explanation and description of each officer of MPPC and SPPC;

i.    all Articles of Organization for MPPC and SPPC, and any amendments thereof;

j.    all operating agreements relating to MPPC and SPPC, and any amendments thereof;

k.    all bylaws of MPPC and SPPC, and any amendments thereof;

l.      all annual reports of MPPC and SPPC, filed with any jurisdiction;

m.      all state, local and federal tax filings of MPPC and SPPC;

n.      all minutes of any meeting of the directors, members, partners, officers, and/or managers of MPPC and SPPC;

o.      "all documents and communications" explaining or describing the capital structure of MPPC and SPPC;

p.      "any agreements and contracts" between Marathon and MPPC and between Speedway and SPPC, "including, but not limited to," cash-pooling agreements, administrative services agreements, assignment and assumption agreements, agreements concerning payroll, real estate agreements, leases and purchase agreements;

q.      "any agreements and contracts for MPPC and SPPC, with any vendors, suppliers, distributors, manufacturers and/or transaction processors, including but not limited to" manufacture of gift cards, purchase of stored value cards from suppliers, distribution or shipment of stored value cards to Marathon or Speedway stores, third party distribution networks that market stored value cards, transaction processing or posting services at point of sale terminals;

r.      "any accounting and bank records evidencing" payroll payments made by MPPC and SPPC employees and the transfer of assets and/or liabilities to MPPC and SPPC.

70.   Plaintiffs responded by describing the gift card programs and providing documentation showing that MPPC and SPPC are Ohio limited liability companies whose principal places of business are in Ohio that do not collect the names and/or addresses of purchasers or recipients of the gift cards they issue, solely for purposes of showing that Delaware lacks standing to claim any unredeemed gift cards, even if any exist.  MPPC also produced copies of its Prepaid Card Sales and Service Agreements with SVM, LP, Scripcents LLC and National.

71.   Plaintiffs also produced extensive additional information, including articles of organization, operating agreements, copies of consents of the Member appointing officers,

approving contracts and authorizing transactions, as well as copies of W-2 forms for employees of SPPC – documents from which Defendants and Kelmar could confirm that MPPC and SPPC were in fact separate operating entities.  Marathon and Speedway asserted written objections, however, to producing any additional financial or transaction level information and/or information related to any decisions to create MPPC or SPPC, and information unrelated to whether MPPC and/or SPPC had unclaimed property escheatable to Delaware.

72.    Four months later in an October 28, 2015 letter, Kelmar informed Marathon that Delaware had instructed Kelmar to obtain and review all of the requested information in the IDR that Plaintiffs had not produced, notwithstanding Plaintiffs' objections.

73.    Because the DUPL does not provide for pre-compliance review of information requests, in a November 10, 2015 letter to Michelle Whitaker, Marathon's counsel, Diane Green-Kelly, objected to the requests for the voluminous, irrelevant information, explaining that Delaware lacked standing to claim unredeemed gift cards issued by MPPC and/or SPPC, citing, *inter alia*, the *Texas Cases* and the decision in *N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 395 (3d Cir. 2012), where the Third Circuit held that New Jersey could not claim owner unknown unredeemed gift cards issued by limited purpose entities domiciled in other states, like MPPC and SPPC here.

74.    Plaintiffs received no response from Ms. Whitaker.  Instead, two months later, on January 26, 2016, Kelmar sent a letter to Marathon (attached as Exhibit A hereto) stating:

> The Delaware Office of Unclaimed Property ("Office") provided Kelmar with a copy of the letter from Reed Smith dated November 10, 2015 and asked Kelmar to confirm whether any responsive information has been provided to date; Kelmar confirmed that no responsive information has been provided to date (Marathon's positions and objections are duly noted). The Office has indicated that Marathon's continued failure to provide the requested information will result in the Office referring the matter to the Attorney General's Office for consideration of enforcement action.

75.   Kelmar set a deadline for Marathon to respond by February 19, 2016, or "Kelmar will be reporting … to the Office on Monday, February 22, 2016."

76.   The Attorney General is currently prosecuting a lawsuit against eighty-six defendants, including seventeen Delaware incorporated companies, under the Delaware False Claims Act seeking treble damages and attorneys' fees and costs, for failure of the Delaware incorporated entities to escheat unredeemed gift cards issued by third-party special purpose entities organized in other states.   *See Delaware v. Card Compliant, LLC, et al*, C.A. No. N13C-06-289 FSS, at 6, 21 (Del. Superior Nov. 23, 2015).

77.   Delaware's position in that lawsuit conflicts with *N.J. Retail Merchants v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012), where the U.S. Court of Appeals for the Third Circuit upheld a preliminary injunction against New Jersey enjoining the state from enforcing an amendment to the New Jersey unclaimed property law that authorized New Jersey to claim by escheat unredeemed gift cards that were issued by special purpose entities organized in other states, just like MPPC and SPPC here.

78.   Although unclaimed property audits are supposed to take no more than two years, Marathon has been under audit by Kelmar on behalf of Delaware for almost *nine years.*   It has incurred significant legal and professional fees to defend against the audit, which has consumed hundreds of hours of employee time and required Marathon to produce every bank account and bank reconciliation, detailed transactions with customers and vendors, and details of gift certificate and coupon programs covering periods back to 1981.

79.   In those nine years, Kelmar has not identified any evidence of material or systemic noncompliance with the DUPL.

80.    After nine years of reviewing Marathon's detailed accounting records, Kelmar will not be able to collect its fees unless it can find a way to assess a liability against Plaintiffs. Delaware relies heavily on Kelmar for auditing services and has an interest in Kelmar's viability. In June 2014, Delaware had 375 pending unclaimed property examinations and Kelmar was handling 300 of those audits.

81.    Although the DUPL authorizes the State Escheator to issue a summons to compel testimony and require proof material to an investigation, it does not ***require*** a summons and the DUPL does not provide for court or independent administrative pre-compliance review, including any procedure for review of an assessment of penalties or interest, until the audit is completed.

82.    When companies object to IDRs, the Audit Manager regularly threatens interest and penalties for failure to "cooperate."

83.    The administrative review process in 12 *Del. C.* § 1156 authorizes only reviews of a final determination of liability by the Audit Manager, including interest and penalties:

> [T]he holder may file with the Audit Manager a written protest of the statement of findings and request for payment in which the holder shall set forth the property type or types and amount of abandoned or unclaimed property protested, and the specific grounds upon which the protest is based.  The protest is intended to allow the holder to have its objections ***to the final request for payment*** reconsidered in the first instance internally within the Department of Finance by the Audit Manager as a means of expediting resolution of any dispute.

12 *Del. C.* § 1156(b) (emphasis added).

84.    Therefore, there is no procedure whereby a holder can have its objections to the scope of Defendants' audit and information requests resolved before penalties and interest are already assessed.  The Audit Manager's threat to assess penalties and interest if a holder fails to "cooperate" looms over every audit.

85.    Further, the audit has been ongoing for nine years and the IDR creates uncertainty regarding the scope of Defendants' authority to claim property by escheat that the *Texas Cases* do not permit.  Because Ohio and Illinois do not require the escheat of unredeemed gift cards, MPPC and SPPC operate their businesses knowing that as long as they continue to honor gift cards presented for redemption indefinitely, funds from unredeemed gift cards remain available for use in MPPC's and SPPC's operations until claimed by gift card recipients and funds, in part, their operations.  Especially in light of Kelmar's estimate of liability of more than $8 million from Speedway's issuance of materially fewer paper gift certificates issued prior to 2000, MPPC and SPPC face uncertainty regarding whether Delaware can even claim their unredeemed gift cards.

86.    Because penalties and interest are calculated as a percentage of the amount of unreported unclaimed property (*see* 12 *Del. C.* § 1159), the longer a final determination is delayed, the more penalties and interest accrue before MPPC and SPPC can obtain court or administrative review.

87.    The threat of injury is sufficient to disrupt MPPC's and SPPC's operations such that they should not "'have to await the consummation of the threatened injury to [seek] preventive relief.'"  *See Delaware v. Bennett*, 697 F.Supp. 1366, 1371 (D. Del. 1988).

88.    Plaintiffs' lawsuit is ripe for judicial determination because (a) it raises purely legal questions concerning federal preemption and whether the DUPL is facially unconstitutional; (b) Defendants expressly set a deadline of February 19, 2016 for compliance with the IDR before enforcement action by the Attorney General's office would commence, *see Delaware v. Bennett*, 697 F.Supp. 1366, 1370 (D. Del. 1988); (c) the controversy has a direct, continuing and immediate impact on Plaintiffs because the threat of injury is enough to disrupt Plaintiffs'

businesses, due to the uncertainty of what is escheatable to Delaware and the scope of MPPC's and SPPC's reporting obligations under the DUPL (despite the *Texas Cases*) and continually accruing penalties and interest; and (d) an order by this Court declaring that Delaware cannot claim MPPC's and SPPC's unredeemed gift cards and enjoining Defendants from enforcing the IDR would expedite a final resolution of the dispute and not merely impeded or frustrate Defendants' enforcement of the DUPL.  *See id.*

## COUNT I

### (Violation of And Preemption by Federal Common Law)

89.   Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

90.   The Supreme Court established the federal common law governing a state's authority to escheat intangible unclaimed property and stated expressly that the federal law preempts state law.  The priority rules preempt state escheat laws in the Third Circuit.

91.   Federal common law grants authority to escheat to the state of the creditor's last known address.  If the debtor lacks addresses of the creditor, the debtor's state of incorporation has authority to claim the unclaimed intangible property.

92.   MPPC and SPPC are Ohio limited liability companies with principal places of business in Ohio.  They do not obtain the names and addresses of purchasers or recipients of gift cards they issue.  Therefore, only Ohio has standing to claim unredeemed gift cards under the secondary rule of the priority rules.

93.   The only purchasers of MPPC and/or SPPC stored value gift cards whose names and addresses MPPC and SPPC obtain are SVM, Scripcents and National, purchasers with addresses in Illinois and Michigan.  To the extent any of those purchases resulted in unclaimed property, only Illinois or Michigan have standing to claim that property, not Delaware.

94. Therefore, the DUPL violates the federal common law and is preempted.

95. Plaintiffs respectfully request that the Court enter an order declaring that the DUPL violates and is preempted by federal common law to the extent it authorizes Delaware to claim MPPC and SPPC unredeemed gift cards, and enjoin Defendants from enforcing the DUPL against them.

## COUNT II

### (Violation of the Fourth Amendment To The United States Constitution)

96. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

97. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things." U.S. Const., amend IV.

98. The Fourth Amendment protects corporations, as well as individuals, from illegal searches and seizures. *See City of Los Angeles v. Patel*, 135 S.Ct. 2443, 2452 (2015); *See v. City of Seattle*, 387 U.S. 541, 543 (1967).

99. The DUPL authorizes the State Escheator to examine books and records, take testimony and obtain proof to determine compliance with the DUPL, but does not *require* the issuance of a summons and does not provide any procedure for pre-compliance review by a court or through an independent administrative process.

100. Consequently, Plaintiffs would have to incur the cost of complying with the IDR, and suffer significantly increased liability, as well as interest and penalties, *before* their objections can be heard and resolved.

101. Further, Plaintiffs are faced with uncertainty concerning the operation of MPPC's and SPPC's businesses until Defendants' audit concludes. The audit has been ongoing for nine years already and is not concluded. The IDR creates uncertainty regarding whether MPPC and SPPC are required to escheat to Delaware. Because of a lack of pre-compliance review, Plaintiffs face the uncertainty of whether they should be escheating unredeemed gift cards to Delaware, even though Delaware lacks standing to claim the unredeemed gift cards under federal law.

102. In addition, because penalties and interest are calculated as a percentage of the amount of unreported unclaimed property, if Plaintiffs are required to wait to resolve the federal preemption and U.S. Constitutional issues they raise until a final determination of liability is made, which must include any penalties and interest, those penalties and interest will continue to accrue until a final determination of liability is made.

103. The audit has already gone on for nine years; because there is no statutory limit on how long Defendants may conduct an examination, they and Kelmar can manipulate the process to maximize Plaintiffs' liability by simply refusing to conclude the audit until the liability accumulates, thereby allowing Defendants to assess ever increasing interest and penalties that will provide revenue to Delaware that no owner can reclaim, even if the unredeemed gift cards are escheated.

104. Therefore, the DUPL violates the Fourth Amendment to the United States Constitution. *See City of Los Angeles v. Patel*, 135 S.Ct. 2443 (2015).

105. Plaintiffs respectfully request that the Court enter an order declaring that the DUPL violates the Fourth Amendment to the United States Constitution, and enjoin Defendants from enforcing the IDR against them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an order:

A.      Declaring that the DUPL violates and is preempted by the federal common law established in the *Texas Cases*;

B.      Declaring that the DUPL violates the Fourth Amendment to the United States Constitution;

C.      Enjoining each Defendant, preliminarily and permanently, from enforcing the IDR against Plaintiffs;

D.      Enjoining each Defendant from assessing penalties or interest against Plaintiffs; and

E.      Awarding such other and further relief as the Court deems just and equitable.

Dated:  February 11, 2016                         Respectfully submitted,

                                                  REED SMITH LLP

OF COUNSEL:                                       */s/ Brian M. Rostocki*
                                                  Brian M. Rostocki (No. 4599)
Diane Green-Kelly (*pro hac vice* pending)        John C. Cordrey (No. 5324)
REED SMITH LLP                                    1201 Market Street, Suite 1500
10 South Wacker Drive, 40th Floor                 Wilmington, DE 19801
Chicago, IL 60606                                 Telephone:  (302) 778-7500
Telephone:  (312) 207-1000                        Fax:  (302) 778-7575
Fax: (312) 207-6400                               brostocki@reedsmith.com
dgreenkelly@reedsmith.com                         jcordrey@reedsmith.com

                                                  *Counsel for Plaintiffs*